The green light means you're good to go. When you see the yellow light, that means you're beginning to consume your rebuttal time. And the red light is the end of your allotted time. We'll hear argument first in No. 051518, Optivus Technology v. ION Beam. Now, I think the appellants have decided to divide their... In fact, I guess both sides are dividing their arguments. So it will be a bit of a challenge to keep track of time. But I'm sure that Ms. Braun is up to it. So why don't we start then. Mr. Miller, are you going first? I'll be around. Mr. Holcomb. Mr. Holcomb first. Very good. Good morning. May it please the Court. I'm John Holcomb. I'm here for Loma Linda, one of the appellants. And I'm here to address the patent issues in the case. There are six patent issues up on appeal. They have to do, of course, two of the patents, the 287 patent and the 581 patent. There are four issues with respect to the 287 patent. They are the Court's erroneous summary judgment decision of invalidity for obviousness of the two claims of the 287 patent. And three issues on the 287 patent having to do with the Court's erroneous summary judgment of non-infringement. Well, we haven't made that decision quite yet. Yes, Your Honor. That is what we're appealing. Those are the issues with respect to the 287. And then on the 581, there are two issues. One is we are appealing what we believe is the District Court's erroneous decision of invalidity for obviousness of all 13 claims of the 581 patent. And we are also appealing a claim construction issue on one of the limitations of the 581 patent. If I may begin with the 287 patent and the summary judgment decision of invalidity for obviousness, the District Court made a number of errors that are apparent from its opinion. Let me focus in on one that I wanted to make sure that you had a chance to address. The question of the CDR prior art. Now, I recognize that you contend that you did not admit to the prior art status of the CDR. But setting aside the question of whether you admitted to it, did you anywhere in the record contest the fact that the CDR was prior art? And if so, could you point us to that? Setting aside that we didn't admit that it was prior art. I believe the answer is no. The appellants did not contest the prior art status of the CDR. However, the reason we did not is because the IBA did not argue that the CDR was prior art, except through its argument that we were stopped from arguing otherwise through the submission to the PTO and the statement in the January issue of disputed facts. Well, in the summary judgment papers, as I read them, there were references to the CDR by the appellees as prior art. And my question to you would be, did you at any point say, no, it's not prior art? Yes, Your Honor, I believe we did, among other places, in the statement of disputed facts. That would appear at page 7363 and 7364 of the joint appendix. In the central district, the court has the party opposing the summary judgment motion, of course, respond to the January issue of disputed and undisputed facts. I was aware of that, and that's the place where you say the applicants never characterized it as prior art. But that's not saying it's not prior art. That's simply saying we never called it prior. In other words, one could say that I never admitted committing a murder, but that's not the same as saying I didn't commit the murder. Did you ever say you didn't commit the murder, to use the analogy? To be clear, I don't think we ever said it that clearly, but I don't think we ever needed to, because I don't think that the ABA ever put that issue squarely in dispute. And I do believe that it's their burden to do so and to show that the CDR is prior art by clear and convincing evidence to prevail on summary judgment of invalidity for obviousness. Returning to the 287 patent and what we believe to be the erroneous decision of summary judgment for invalidity for obviousness, the district court in its opinion made a great number of errors that are apparent simply by reading it. The court applied a piecemeal invalidity analysis. It said, for example, the issue presently being considered is whether the claim term and injector is obvious. It later says the claim term and injector is obvious. Of course, a court conducting an obviousness analysis may not go through element by element and find each element obvious or not obvious. That's not how it's done. That's a violation of Graham against John Deere and, of course, a number of this court's opinions on how one conducts an invalidity analysis. And let me also say, as long as I'm talking about invalidity, let me shift quickly to the 581 patent. The district court erred in finding the 581 patent invalid for obviousness for a number of reasons. One extremely egregious one is finding it obvious over the Harvard cyclotron laboratory. The HCL prior was not even argued as an invalidating prior reference by IBA. But the district court also relied on the Fermilab neutron device, did it not? It did, Your Honor. And we showed where there was at least a genuine issue of material fact for why the Fermilab system did not have the claimed elements of the 581 patent, the most important of which was that- Based upon the verifying step? Yes, Your Honor. That's the most important one. The final point that I wanted to make on the 581 patent and the district court's decision was the district court invalidated claims, all of the claims, without conducting an analysis of any more than the first two claims. And it said in footnote 30 of its opinion on page 216 of the joint appendix, the court does not engage in a lengthy discussion of all the similarities and differences between claims 1 through 13 of the 581 patent and the Fermilab prior. The district court goes on to say, I looked at the record and I think it's all there. That's not how an invalidity analysis is done. And for that reason, that particular decision must be reversed. I see that I'm out of time. I'll turn it over to Mr. Moore. Thank you. Very good. Mr. Miller. Good morning. Good morning. May it please the court, Howard Miller for Plaintiff and Appellant, Optimist Technology. I know that the respondent sent to the court on Friday of last week another case, the Rita medical case, on the issue of the California competition law. But the Rita medical case changes nothing. It was a case where the FDA had made a determination that the 510K should have been issued. What's the problem here in the discussion of the UCL is a major conceptual misunderstanding. And that goes to the district court's finding that exhaustion of administrative remedies was required. We're not contending that the 510K never should have been issued. We don't go into the FDA and say on July 12th, 2001, you should not have approved the 510K. The gravamen of the dispute here is that the marketing of the device prior to July 12th, 2001, without the 510K pre-market approval, constitutes a violation of the California competition law. I take it that your position is that there would have been a violation even if there had been no correspondence whatsoever between FDA and the client. Absolutely. That is absolutely correct, Your Honor. The correspondence is irrelevant to the existence of the violation. If we allege the violation and prove the violation, whether the FDA wrote a letter or not makes no difference. And Summit 1, which causes the confusion here, was decided before the California Supreme Court made clear that even where there's no private cause of action under the predicate acts, the UCL applies.  Summit 1 in its last paragraph explicitly says we're deciding this in the absence of California state authority. California state authority subsequently followed. I'd now like to turn to the Lanham Act because I think the Court made a fundamental error in its Lanham Act analysis by finding no disputed issue of material fact. And if there is one exhibit in the joint appendix that I would point the Court to, it's joint appendix page 14,922. Joint appendix 14,922 are September 2000 notes of an August 25, 2000 meeting of the University of Florida committee. And in those notes, it says, as of August 2000, that the only two viable contenders for the sale were IBA and Optimus. The district court in its opinion says what difference does all this make since Hitachi was ranked second? But Hitachi was ranked second in a previous consultant's report. And as of June, and this is clearly dated out at page, I think it's 14,809, but 14,922 confirms it. University of Florida had already made a determination that because of its pricing, Hitachi was out of the game. So as of August and September 2000, there were only two viable candidates left. Now, what does that mean? What is the disputed issue of fact? The district court and the respondent's briefs give great credence to Dr. Tischer's testimony from the University of Florida. That's flatly contradicted. First of all, if the court looks at the references to Tischer, the summary of them in the brief is very different than the precise question and answer he gave on whether $50 million had been promised by IBA and whether it was material. Tischer is asked, did you immediately, was there an agreement to immediately fund? He says no. Was there an agreement to directly fund? He says no. Every question and answer is what we always call the negative pregnant. It denies that, but it doesn't flatly say there was never discussion. In fact, that same exhibit, 14,922, clearly states that IBA has indicated an interest in funding the entire technical side of the installation. In addition, it's flatly contradicted by Mr. Anderson, who worked for IBA, and says, I was instructed to and did promise a $50 million investment. The brief characterizes Anderson's statement as hearsay. It's not the respondent's brief. It's not hearsay. It's Anderson saying what he said. Dr. Slater, Optivus' president, says he was told by Dr. Tischer that the reason IBA got the job was because of the $50 million promise. Again, the respondent's brief characterizes that as hearsay. It's not hearsay. Under the Federal Rules of Evidence, Tischer is an executive officer of the defendant. It's clearly that Tischer comes in clearly as either an admission given the status of the parties or a declaration against interest under the Federal Rules. So what we have here are credibility issues. We have Dr. Tischer's credibility on all the critical Lanham Act issues. And we have against that the declarations and deposition testimony of Dr. Slater, plaintiff's president, and of Mr. Anderson, who worked for IBA. It's a flat conflict of credibility. This is exactly what trials are for. The judge on the motion on summary judgment cannot look at this conflicting testimony and says, I'm deciding to give credence to Dr. Tischer. There is a flat conflict that requires the standard test of credibility is seeing the witnesses and subjecting the witnesses to full and complete cross-examination before the trier of fact. So we think there's a fundamental conflict in the Lanham Act cases. On the Florida matters, the issue is the sale, the contract was finally signed with IBA in December of 2001. It was only on July 1, 2001, that non-consumers could sue under the Florida Deceptive Unfair Practices Act. The way to see that it is proper to... And permission from the FDA was, I gather, July 12th, is that right? Permission was July 12th. There was an actual, that's absolutely correct, Your Honor. There was a 12-day period there when there still was a violation. But the easy way to see this, I think, is to say, suppose before July 1, 2001, a business could sue, and it wasn't simply limited to consumers, and a suit had been brought before July 1. We all know that IBA's defense would have been, you can't bring it now, no damage, because no final decision has been made by Florida. The damage occurs when the contract is signed with IBA. We consistently argue this was a continuing tort through the whole period that ended the damage. So the post-July 1 events justify an action. And as for... What would you have said if the permission had been granted on June 28th, 2001? Would you say there's still a tort? Oh, yes, because the gravamen of the complaint under the Lanham Act does not... The gravamen of the complaint is not simply the allegation of the complaint about the UCL. The Lanham Act rests on a sense of other facts, including the $50 million promise. Well, but I mean with respect to this element only, the marketing without permission factor. I think that is a very good question, Your Honor. I think the damage still would have occurred in December, because the granting of the permission by the FDA on June 28th would not have ended the decision about to whom Florida was awarding the contract. Florida awarded the contract in December, five months after the approval from the FDA. So whether the FDA had approved on June 28th or had approved on July 12th, I think would not have made a difference. Though the fact that there was this additional period where there was a violation, I think, is important. And as for the Florida intentional interference claim, again, this rests on the district court determination that there was not the required relationship between the parties, between Optimus and the University of Florida. I think I know the answer to this, but clarify this for me, if you would. That we've got two different state law regimes operating here, California and Florida. Why do we have the two separate states implicated? Because some of the torts occurred in California and some occurred in Florida. And so for each of the separate causes of action, it's appropriate to allege where the gravamen of the tort occurred. And what aspect of the tort occurred in Florida? Excuse me, in California. I understand the Florida connection, but where does the California tort have its, what gives California, in a sense, venue, so to speak, over that tort? I see the red light is on. Go ahead, please. The quick answer is that the California conflict of law analysis is not strictly based on the place of the tort. It's based on the Currie-Trainor interest analysis. And because California citizens were involved, it's the California interest that enables it to apply its law. I see. So you're not, it's not a cytosine quo. That's not the California law, conflict of interest. We get there via the California conflict law. We get there via the California court applying the California conflict law. Okay, thank you. Thank you very much, Your Honor. Okay. Now, let's see. Mr. Wine and Mr. Ferguson. Is it Mr. Wine goes first? Mr. Ferguson. Mr. Ferguson. Well, I'm 0 for 2. Very well. Go ahead, Mr. Ferguson. Good morning, Your Honor. May it please the Court. Brian Ferguson for Ion Beam Applications, and I'll be addressing the patent issues this morning. This appeal presents two sets of claims to the Court. There's the claims that Loma Linda wishes they had written, and then there's the claims that actually appear in the patent. And, of course, those are the ones that control. And what I would like to address first is the issue of non-infringement of the 287 patent. Now, if we were to conclude agreeing with you that the 287 patent is invalid, we would not need to reach, I take it, the infringement issues? In fact, Your Honor, if the patent is invalid, that's correct. We would say that you would not need to. No collateral consequence to the infringement issues that would require their being addressed, notwithstanding a finding of performance on them? That's correct. That would be correct, Your Honor. And also we would take the position that if you were to affirm on the non-infringement, that in this particular instance you would not need to address the issue of invalidity because the 287 patent, the injunctive term of it expires next month in September. So our position would be that we are then past the point where the 287 patent could have any impact on us from an injunctive standpoint. So under the facts of this particular circumstance, we would take the position that if you affirm on non-infringement, you could simply vacate the invalidity finding. But turning to non-infringement, clearly the claim requires there be a gantry at each treatment station. The claim requires a plurality of treatment stations and a gantry at each one. The evidence is undisputed that IBA does not have a gantry at every treatment station. And this is one of the claims, one of the situations where the plain language of the claim controls. The language is unambiguous. It requires a gantry at each treatment station. Loma Linda raised this in front of the Patent Office. They relied on arguments for the Patent Office that there had to be a gantry at each treatment station. Well, the claim calls for a number of treatment stations. That's right. And then says there's a gantry at each treatment station. So if you say, well, an accused has, say, three treatment stations, two of which have a gantry, one does not, why doesn't that claim read on that in the sense that there are two treatment stations that have gantries, et cetera, et cetera? Now, granted, there is a third, but what difference does that make? Well, I think it makes a big difference, Your Honor, because under that interpretation, and that's the position that Loma Linda is taking, it reads the word each out of the claim. The way in which that argument is made, that would hold water if the claim said a plurality of treatment stations with gantries. And then you could have a treatment station without a gantry under that claim language. That's not what the claim says. It says a plurality of treatment stations and a gantry at each treatment station. So it doesn't matter how many treatment stations there are. They each need a gantry. But in my hypothetical, with three treatment stations, two of which have gantries, one of which does not, there is a plurality of separate treatment stations. There is a plurality of separate treatment stations, but each need a gantry, according to the plain language of the claim. Well, I mean, what precludes the claim reading on the first two treatment stations as the plurality? It does. The first two treatment stations could certainly be the plurality of claims, the plurality of treatment stations, but because the claim goes further and says there needs to be a gantry at each treatment station. Each of those treatment stations. Every treatment station, because each means every. That is the common and ordinary meaning of the word each. The district court found that, and Loma Linda never disputed, that each means every. The biggest problem that I see with your argument here is figure one. And, I mean, there is a pretty strong doctrine in our law that, absent an amendment that clearly backs away from something in the spec, or some other explanation for why it is that the spec is to be read as having an embodiment that is somehow excluded from the claim, we normally look to the spec and say, well, there's your preferred embodiment. Whatever the claim means, it probably is going to include that. I find it difficult to get around the conclusion that, while there's ambiguity, perhaps, along the line of your discussion with Judge Lynn, as to the meaning of plurality and each. How do we get out of figure one? I think that there are two answers to that. The first is that the word each is not ambiguous. This is not a situation where the claim requires a special interpretation to a person of ordinary skill in the art. This is the type of claim where laypersons can understand the language. And anyone reading the claim would have to think that I have to have a gantry at each treatment station because that's the plain language of the claim. Now, this is one of the situations where I believe, like in Chef America, where this court said that when the language is clear and unambiguous, the canons of claim construction are an opposite. And we have to construe the claims based on the patentee's version as he himself drafted it. And I would also point the court to the Electa case, which is 214 of 1302, where this court has held that there are situations where the preferred embodiment is excluded because the plain language of the claim does not cover the preferred embodiment. This is one of those cases. There wasn't any amendment, I take it, or any prosecution history that sheds light on this point, I take it. Well, actually, Your Honor, I believe there is because in the prosecution history, and this is in the record at JA 876 to 880, in responding to a rejection from the PTO, the applicant says explicitly that the prior art does not teach a gantry at each treatment station. And I can pull that up and we can look at that. But I think that in this particular case, that is a clear admission that there needs to be a gantry at every single treatment station. In discussing the prior art, he said... What page? This is page 879 of the record, Your Honor. Martin does not teach and his multiple station system would not benefit from the addition of a gantry, let alone a gantry at each patient station. So we believe here, again, that the file history merely supports and merely confirms the plain language of the claim. Now, there are, of course, other grounds we've raised for why there is not infringement of the 287 patent, the fact that the IBA system lacks an injector, as claimed, and also the fact that there is no operator control means within the language of the claim. I will, unless you have specific questions on that, I'd like to turn to the invalidity arguments now. I'd like to start with the 581 patent. The record that is before you, from Loma Linda's perspective, is shockingly sparse in terms of the actual evidence that they have submitted to rebut the evidence that IBA put forth of invalidity. And I want to raise, in particular, the question of the verifying step, which you asked counsel for Loma Linda about. Dr. Lennox, who is the person in charge of the Fermilab system, put forth a detailed point-by-point declaration setting forth how the operation of Fermilab works. And she relies on the Rookie Book, which was an evidence, which is a description of how it functions, and she relied on her own diagrams that she drew in which showed the operation of the system. And if I may, turning to the Rookie Book itself, which she relies on, at JA 5843, it describes the beam request signal. It's called enable, and it's a request for beam that is sent to the PROM module. And there are three types of enable signals, and one of them is NTP. That's the neutron treatment therapy. I'm sorry, Your Honor, it's 5843, and that's in Volume 2, I believe. Got it. And then we learn at JA 5848 that the request for beam is sent from the NTF interlock module. So there's a module that sends a request for the beam, or that generates the request for beam, and it sends it on to the PROM module. And this is at 5851, and this is the function that is described exactly in the 581 patent we submit. And this, again, was not rebutted. At 5851, the PROM module is described as the logic in the control room that looks at the various beam enable inputs and decides which, if any, produce a beam pulse. So it looks at the inputs. One of the inputs is a request for a beam, and it decides whether or not in response to those requests it should send a beam, a treatment beam, on to that specific treatment room. This is unrebutted in the evidence that was submitted by Loma Linda. This is the actual operation of the Fermilab system, and it is clear that it meets each and every limitation of Claim 1 of the 581 patent. And, again, there's no evidence in this record that is anything other than a mere denial from Loma Linda's experts in terms of the function and operation of Fermilab. So we believe that the 581 patent, that the judgment of invalidity should be affirmed. Turning quickly to the 287 patent, the point I wanted to address was this one about the conceptual design report being effective prior art. In below, IBA submitted evidence and submitted the argument, and you'll find this at JA5002. Let me just go back to that. The portions of the joint appendix to which you have just referred, I didn't see that in your argument section of your brief that you had gone through those the way you have now. Was that in your brief? Well, no. What we've done is we've relied on the district court's reliance on the evidence that was before it. And that evidence was submitted, and we did summarize in our brief the testimony of Dr. Lennox. Right. But the sections of the joint appendix, the list of terms that you just were referencing, I didn't see that. I don't believe that we may have submitted those specific pages. This was new matter to me. Okay. On the conceptual design report at JA5002, we, IBA, argued below that the conceptual design report was prior art that, in combination with the University of Washington facility, rendered obvious the 287 patent. And, again, I don't think you'll find anything in the record below where Loma Linda did anything except argue the merits of the conceptual design report, not submitting evidence that it was not prior art. Other than your assertion that they had acknowledged that it was prior art by virtue of their inclusion in that, in the submission to the examiner, do you elsewhere assert that it was a prior art publication? And, if so, do you happen to have those references at hand? Well, we would rely on the conceptual design report itself for evidence of that. It's dated June 1986, so it's more than a year before the final date. The question is really public dissemination issue. And that's the one in which the dispute here is. Sure. There are 41 people listed on the conceptual design report as having contributed to it. Only four of those are the inventors. So the remaining 37, this is a small universe of people who would be interested in this document, the remaining 37 are the interested audience in terms of those who would have the report and there is no restriction on the report in terms of whether it can be copied or distributed or anything like that. All right. Any questions of fact? We believe that the conceptual design report on its face indicates that it has been published because of the listing of the 37 people in the report itself who contributed to it who are not the inventors. So we believe that establishes the prior art status of it. But for purpose of summary judgment, I take it your position is that you asserted that it was prior art and the non-moving party did not introduce evidence to contravene that submission and therefore under Celotex that issue is gone. That issue, right, that issue was waived and is not ripe for discussion here. I'm into Mr. Weinstein. Thank you. Mr. Wein? Your Honor, I see that I have, Your Honors, I see that I have only about two minutes so I'm going to have to talk a bit into sound bites. I am Mark Wein and may it please the Court. I think that from the position of Ion Beam, the arguments that have been raised in support of reversing the unfair competition and related common law and statutory counts are well argued by counsel for optimists but we really miss the point. The Lanham Act goes not just to what was said, it's what influence what was said had on the prospective audience. In this case there's an audience of one, it's an unusual case. It's not broadcast to millions and this Court doesn't need to engage in having survey data and project what kind of influence might have occurred. The influence is found in the notes, the deposition, the declarations of the people at the University of Florida who made the decision and Dr. Tischer, despite what Mr. Miller said in his argument, is not a party. The University of Florida is not a party. They are a third party. They were looking for a vendor and the record here of what the vendors looked at and considered and were influenced by does not include, nor is it even alleged by optimists, that there is any showing that these were influential factors that caused the decision to go one way or the other. They are speculating. I understand that to be part of their claim. In fact, I thought that the whole point of Mr. Anderson's testimony was that this was important at the time that the offer was putatively made. Mr. Anderson doesn't quote anything. That was his summise from that situation. Right. But that is whether, regardless of what the strength of Mr. Anderson's testimony may be, I thought that was part of the submission made by the House. Mr. Anderson said that his takeaway from the discussion when he presented what he claimed to present, which was denied by Dr. Tischer, was that this was important to them. Right. I don't know if that certainly isn't the same as the person who is receiving it saying we wanted the best technology, price was not the most important factor, and there was no discussion in any of the documentation by any of the committees that looked at this as to that the prevailing party needed to have anything about financing in their proposal. None. Now, there was a concern about optimists having backing generally, and there is a financial aspect to that, but that goes to the financial wherewithal of the company to build the equipment, which itself is going to have a value of $50 to $70 million. And Dr. Tischer says I was concerned about them not having the assets to do that. But it really turns the Lanham Act upside down by making it look only at what was said when the evidence here is complete with we relied, we did our own investigation, we made our own judgments, we made our own reliance on the technology, the consultants' reports. There are 60 to 70 people at the University of Florida, according to Dr. Tischer, that were part of this effort, including consultants. Now, let me say on the FDA, unless you have another question on that. My red light is on. You can take another minute or so, and I think you're going to move to the California FDA. Yes. Yes. I think now we've written the FDA out of this situation entirely. The two cases that are cited, and the California UCL statute is back to the Supreme Court. It's one of the most litigated statutes of its type in the country. But clearly it requires an unlawful act. That's what this is going to. And the issue is can we find unlawfulness under the FDA Act without the FDA saying so? That's really what Mr. Miller is saying, and I don't believe that's true. And the reason why he doesn't want to deal with the letter in the record is because the letter is an inquiry letter. It invites a response. It threatens no enforcement. There was no enforcement. In the record, there is also a letter back from the Saul Ewing firm, representing IBA, saying thanks for having the discussions. That only establishes this was a dialogue. It was an interim decision, just like the Biotics case, and, frankly, just like the Primo case where the Second Circuit, even though it's not binding on us, both those courts said we're not going to delve into those areas where the FDA is charged with responsibility. But why do you think that there is no predicate act here for purposes of the California statute, even setting aside the letters, simply by virtue of the assertion of a violation of federal law, i.e. commercializing the product without FDA permission? Well, if you read the Saul Ewing letter in the record, what it says is the model that IBA was operating on under the PTCA company was they were going to own the center and get involvement by research hospitals or research institutions like the University of Florida. That's recited in there. That's what Mr. Anderson was talking about. There wasn't going to be a sale. They were going to put up their own center and get a sponsorship, if you will, and involvement through the medical community of a well-known research institution, i.e. the University of Florida, similar to what was happening at MGH. This is getting pretty far afield from the ground on which the trial court decided this case, as I understand it, that being failure to exhaust administrative remedies. That will be my last point, Your Honor. He used exhaustion in the way that the Primo court cited by Mr. Miller used it, not in the terms of there is an exhaustion of an administrative remedy, but what the Primo court says, and if you read what the court, Judge Otero says, is exhaustion meaning let the FDA reach a final decision, don't base it on an interim decision. So you're saying there's a sort of failure of proof that there was an FDA violation? There was certainly a failure of proof that the FDA had reached that conclusion. It was an interim conclusion. It was not stated in absolute terms. But that's different from an exhaustion of administrative remedy. If you look at the language that the analysis that Judge Otero did, he talked about finality, even though he used the word exhaustion. Just as when, I think, Pfizer in the Primo case made an exhaustion argument, the court in the Second Circuit said it's not exhaustion in the typical terms. It's getting to a final decision of the FDA before we jump in and make a decision for the FDA. But, again, isn't that a question of fact? Isn't it, separate and apart from the FDA's regulatory realm, just the fact of a violation? Well, if you assume that we can make, I think the decision by the Judge Otero was in the absence of a decision by the FDA, there is no unlawful act to fill in that component of 17200. I mean, just like you'd speculate about anything. I mean, it's just there isn't a finding of unlawfulness. Very well. Thank you, Mr. Wine. We've gone over by about four minutes for Mr. Wine, and in an effort to try to keep things evened up, Ms. Braun, I think, how much time do each of the appellants have left for rebuttal? The first appellant has two minutes and 30 seconds, and the other has two seconds. Okay. Why don't we add, if you would, two minutes to each of them? Yes. Is that satisfactory? Very well. Thank you. Thank you. Mr. Holcomb. Yes, Your Honor. Let me briefly address counsel's arguments on the patent issues. Let me begin with the 287 invalidity issue. And returning to this issue of whether the CDR is prior or not, I think it's telling that all IBA can point to is the document itself, which does not demonstrate that it was a printed publication that meets the requirements of Section 102A or 102B. To merely say, well, the contributors contributed to it isn't sufficient. That isn't sufficient to show, by clear and convincing evidence, that that document was publicly available more than one year before the critical date. Let me also, with respect to the 287 invalidity issue, point out that – Well, just to be clear, though, there were, I take it, references in the summary judgment papers to that document and assertions that it was prior art by the appellees here. Yes, Your Honor. And it was contested, I think, through the point in the record that I pointed to earlier. But also, let me add that if this Court were to conclude that the CDR is, in fact, prior art, that there is sufficient clear and convincing evidence to make it prior art, that still does not render the 287 patent invalid for obviousness, for all the reasons that we cite and that I won't go through at this point. Let me address briefly the 581 patent. Dr. Locke is a plaintiff's expert, and he did submit a declaration in opposition to Dr. Lennox's declaration. Dr. Locke is a software expert, and he actually went through the software code. And in particular, dealing with the prom module, which counsel discussed, Dr. Locke does directly dispute Dr. Lennox's conclusions about what the prom module does. Specifically, Dr. Locke, at pages 13531 and 13532, disputes Dr. Lennox's conclusions. Among other things, Dr. Locke talks about the fact that there is not, in fact, one prom module. There are two prom modules. And the second prom module is used to determine whether or not the pulse shifter would shift, that is, whether to send the beam, and that the second prom did not consider the status of the switching magnet. What was the appendix page again for that? Yes, Your Honor. JA 13531 and 13532. It's paragraph 65. So there is at least a genuine issue of material fact over the underlying facts about the alleged prior art system, the Fermi lab system, that I think overcome the obviousness conclusion by the district court. Let me turn, if I may, to the 287 patent again and the each limitation. Let me deal first with the prosecution history. When the patent lawyer was talking about distinguishing Martin, Martin is a patent from 1976 that has to do with proton imaging, proton radiography. And that particular apparatus claimed in that patent doesn't have any gantry. So the point that the patent lawyer was making in the prosecution history is this doesn't have a gantry. And when he said, much less a gantry at each treatment station, he was parroting the language from the claim itself, which the examiner, I think, had pointed to. The second point that I would like to make that I think is telling on the 287 patent and this each limitation is actually looking at IBA's own brief. In its brief, it presents a hypothetical claim and says this claim would have covered what Loma Linda wants to cover. This is at page 63 of IBA's brief. And IBA's hypothetical claim is a plurality of treatment stations, each having a gantry, and at least one stationary beam treatment station. Well, the addition of a limitation, at least one stationary beam station, limits the claim. It couldn't make it any broader. Therefore, the claim without that limitation must be at least as broad as it is with the limitation. I'm out of time. Thank you, Your Honor. Thank you. And we'll hear next from Mr. Miller. Thank you very much for the extra time, Your Honor. I think the questionings clarified the UCL issue, which is a variation of suppose the FDA never acted. Someone shows up, starts attempting to sell a medical device. The FDA is busy. There are no proceedings. Alleged to be a violation of the act under the California UCL under Stop Youth Addiction and KASCI. That's actionable. But I especially want to focus on the conflict of testimony on whether this was material. Finally, Mr. Wine says, oh, well, it wasn't just that. The Lanham Act question. Pardon me? The Lanham Act question. The Lanham Act question of materiality. Right. And what Mr. Wine winds up saying is, look, maybe, you know, it's not just whether the $50 million was promised or not, but was it material to the audience of one? And Tischer is very – I urge the Court to look specifically at Tischer's testimony in terms of his credibility, because every time he testifies on this, he qualifies. Every time. When he's asked whether there was a $50 million in funding at 6089, the question is, did they promise to directly fund? At 6470, did they promise to put in their own money? The answer is no. At 6491, did they directly fund? And the best he can do in his declaration, his declaration, which he has written very carefully, is that he denies that there was a promise of, quote, and there's up to $50 million immediately to fund the purchase of the IVA system. He puts that in quotes. All of these are negative pregnants on the issue of the $50 million and the materiality. But on the materiality, in addition to Mr. Anderson's testimony, and he was there, he was the one making the sale, Dr. Slater specifically testifies that he was told by Dr. Tischer and the people at the University of Florida that the promise of the $50 million was the reason they chose IVA. And it is further buttressed by those minutes at 14,922, where in the second paragraph there's a specific reference. After the minutes say we're down to two viable candidates, IBA and Optivus. It says IBA then referenced this PCTA. IBA has promised to fund the technical component. We're looking at what they've promised to do on that. So the own minutes indicate that. And then you've got inferences that can legitimately be drawn from the course of events. So when you put all that together, the question is not... Is there any evidence, I'm sorry, any evidence of any detail associated with that promise? It seems, and I think the district court was moved by this as well as I read his opinion, but it seems like a pretty broad statement at best on which people would make a decision of this magnitude. I mean, this is not a product that's sold on late night TV. And operators are standing by a call right away. I mean, this is something that people really get down to the nitty-gritty before making any kind of decision. And just to sort of assert, well, financing will be available, just seems intuitively not to be a very sound ground for distinction between one product and another. The economists have told me so often that price is the determinative factor in decisions, and I've come to believe them, but the issue here is not can we prove that. We don't have a burden of preponderance of the evidence here. The issue is, is there an issue of material fact to go to a jury? And since this rests on the credibility of the people involved, that is an issue that should be decided by them to decide who has the preponderance of the evidence. If a reasonable jury could, taking this evidence, conclude that there was a material misrepresentation. I think a reasonable jury could because do we have enough here to go to the jury? It's a question of what comes out in cross-examination, which is always important. You know, lawyers in deposition often don't do a full cross-examination. They attempt to nail down things and then leave the rest for cross-examination because credibility of the witness is at issue. The issue here is credibility at issue, and does this testimony give enough to the jury? I think it does. I see even with the additional time, my red light is up, so I thank the court again for the additional time. Thank you. Thank you, and we thank all counsel. The case is submitted.